[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTIONS TO MODIFY CUSTODY CODED #296 and #343 and #346
The defendant has filed motions to modify custody coded #296, #343, and #346. The motions coded #343 and #346 were attempts to modify custody pending outcome of the custody trial. Those motions were heard as part of the motion coded #296.
Many of the facts that give rise to these motion are not in dispute. Following a fully contested dissolution of marriage that focused on custodial issues involving the three minor children of the parties, Kenneth Stephen Lane born March 20, 1988 and twins, Brandon Kyle Lane and Courtney Elizabeth Lane both born May 17, 1991, in which both The plaintiff and the defendant proceeded pro se throughout a 12 day trial, the court on July 18, 1997 entered various custody and visitation orders and made various findings consisting in part of the following:
Mrs. Lane is harsh and strident. Claiming naivete, she uses her pro se position to interrupt repeatedly, harass opposing witnesses and guide friendly ones. As a witness, she errs consistently, exaggerates repeatedly and lacks credibility. She is calculating, confrontational and intimidating. She refers to both Courtney and Kenneth as "asthmatics." Their pediatrician, Dr. Jan Fugal, did not agree. She reports that Kenneth almost died of pneumonia. Dr. CT Page 4742 Fugal told the court that at no time was Kenneth's life in danger. She repeatedly and ominously accused father of threatening the children's lives by exposing them to "spinal" meningitis. Dr. Fugal, the children's pediatrician, testified the issue was "viral" meningitis, and, no it was not serious.
 In her zeal to protect her own role with the children, Regina Lane appears committed to denying them the benefits of a father Visitations have diminished over time, occurring primarily when specific court orders were entered or when court supervision was imminent. She has maneuvered Kenneth and Courtney into rejecting their father — and the pressure on young Brandon to join the assault may soon be more than he can handle. He may well join the other two and complete the rejection of their father.
 The court is disturbed by an undercurrent, that often rises to flood stage in cases as adversarial as this one, that father somehow, in some way, may have been physically inappropriate with Courtney. The court rejects the innuendo and finds no credible evidence that such incidents occurred.
 Regina Lane is implacably focused on her "special needs child," Kenneth, and his twin siblings. Anyone who is perceived as threatening her maternal bond must be removed. Father, and his entire family, are seen to represent a threat. Two Superior Court Judges represented such a threat. All have been successfully removed. The unverified claims against the Rossi family, father's sister and husband, and their children, are remarkable for their creativity and their wide range.
 She refuses to accept court adjudications as conclusions of her claims, raising them again and again after a court rejects her position.
 Mrs. Lane's angry assaults are mirrored by her parent's testimony. The most remarkable parental testimony being that of Stephen Link, who, after testifying to his mental health training, offered a video tape of a carefully rehearsed and badly controlled interview with the three Lane children, who were forcibly lead through a parade of statements deprecatory of their father. It was a painful display.
This court views mother as a danger to the best CT Page 4743 interests of the three children if her conduct does not change. The relentless attack, by mother and her parents, on the father of these children, and his family, if it is continued, is likely to do lasting damage to the young Lanes.
 The court has not had the benefit of meeting the children. Both the Family Relations Officers and Counsel for the Minor Children have. And all of them bring many years of respected expertise to their roles. In the current circumstances this court will cautiously heed their recommendations.
2. Custody
 a. Plaintiff shall have custody of the minor children of the parties, subject to the Defendant father's reasonable rights of access, which shall include, but not be limited to the access detailed in paragraph 3, below.
 b. Plaintiff mother shall consult with defendant father regarding all non-emergency health care.
3. Father's Access
 a. Father shall have access to his three children, Kenneth, Courtney and Brandon, every Tuesday and Thursday from 4 p. m. to 7 p. m., without supervision of any kind. Pick-up and return shall take place at the McDonald's in Devon.
 b. On Saturdays from noon (or after mid-day swimming) until 7 p. m., father shall have access to all three of his children without supervision of any kind. Pickup and drop off shall take place at swimming or at McDonald's. Beginning Saturday, October 4, 1997, at noon, father's Saturday access with all three of his children shall expand to alternate weekends, from Saturday at 9 a.m. to Sunday at 7 p. m.
c. Father and children are fully empowered to change:
i. the place of pick up or delivery, or
ii. the place, or places, where the access shall occur, or CT Page 4744
 iii. their activities during access. from time to time as they prefer. Mother shall not participate in those decisions. If she wishes her opinions to be considered, she is limited to written communication with father.
 d. Father is empowered to vary the children with whom he chooses to have access during the dates and times set forth.
 e. In the event of any dispute regarding any of the details of father's access, other than dates and times as set forth herein, father's decision shall be final, though he is to discuss the issue with the children and give consideration to mother's written comments, if any there be.
 f. Neither plaintiff mother nor her family are to offer, encourage or support any activities or programs that would compete in any way with father's access. Father's access as set forth herein shall take precedence over all other plans or arrangements involving the children.
 g. Plaintiff mother may not use the children's apparent refusal to participate in their father's access as a basis for non-cooperation. Because mother has repeatedly shown evidence of her control of the children, and because the children have historically enjoyed their time with their father once they experience time with their father, no refusal to participate is to be regarded as the exercise of free will by the children.
 h. The illness of any child may become the basis for missing an access period only upon advanced presentation of a dated, signed note from a medical doctor specifying the illness and the period of absence required. Father is found by this court to be fully capable of providing the children with normal care during minor illness. Mother is directed to advise father of all treatment modalities and to provide all the medication required during the access.
i. The parties shall each have reasonable access to the children while they are with the other parent, by mail and telephone, during reasonable hours of the day and early evening. CT Page 4745
4. Modification
 a. Should either party seek modification of custody and/or visitation, it is this court's hope that the trial court would apply the following criteria, among others, when considering whether to modify:
 i. Mother has pledged to this court that she would enter counseling. Without such a maternal commitment, given the facts found in this case, the court would not have awarded mother custody. Her serious and consistent participation, her resultant changed behavior, her commitment to further change and the independence and high professional quality of the practitioner she hires are all particularly meaningful.
 ii. Mother has pledged to this court that, for one hour each week, all three of the children would enter counseling in various groupings as Dr. Alan Shulik would, from time to time, recommend. In the past, the three children were not counseled as a sibling group, but were isolated from each other. Without such a maternal commitment, given the facts of this case, the court would not have awarded the mother custody. Counsel for the Minor Children is requested to provide the doctor with a copy of this decision and the evaluation of Family Relations Officer Richard.
 iii. If the children resist father's access, the cause of the refusal is likely to have been a continuation of mother's historic refusal cooperate with the visitation orders of the court. The court has found that she is in control of such matters.
 iv. Whether mother and her family have ceased to condemn father and his family, have begun to show a new and extended pattern of respect for father and his family and have ceased all unproven accusations.
 Now that I have concluded the formal portion of this decision, I have some comments I wish to make.
Regina Lane, I urge you, I beg you, please read and re-read this decision until you understand it. Unless you take the time to understand it, and then follow it, your life could change drastically. And whether or not those drastic changes take place is completely within your own control. CT Page 4746
 Please sit down with Attorney Parley and Attorney Kelley, and your parents, and discuss the changes you and your parents must make in order to maintain your current roles with the children.
 Unless you understand this decision, and follow it carefully and sincerely, you could lose the relationship you now have with your children. Please do not allow that to happen. Remember it is all within your control.
 Kenneth Lane, I know you are disappointed. I'm sorry. But I do not think you are ready yet. You can be. Hang in there. Keep pushing. Be involved in your children's lives.
 I do not know if Regina Lane and her family can change. If they do not change, you are likely to get the modification of custody you seek. If Regina Lane and all three children are not in regular counseling, if the children are not with you as I have directed, if Regina, her parents and the children do not treat you and your family with proper respect, you are likely to become the children's legal and physical guardian.
This trial lasted for 24 days including final arguments. A total of approximately 175 exhibits were introduced consisting of approximately 2740 pages. Most of the trial days were from approximately 9:15 a.m. to approximately 5:00 p. m.
The parties filed voluminous motions between July 18, 1997 and the date evidence in this trial ended on December 8, 1998. The plaintiff filed her brief on December 17, 1998 which was the date the court heard oral argument. Unfortunately the congestion of the court calendar did not allow for all of the motions filed by the parties in this type of case to be heard on a timely basis.
The threshold issue before the court is whether there has been a material change in circumstance between July 18, 1997 and December 8, 1998. Circumstances which courts have generally found to comprise a material change in circumstances include but are not limited to (1) alienation of a child's affections or respect for the non-custodial parent by the custodial parent 15 Am.Jur. Proof of Facts, Child Custody Section 18 (1964), 24 Am. Jur.2d. Divorce and Separation Section 1013 (1983), (2) interference with CT Page 4747 visitation rights of the non-custodial parent by the custodial parent, 28 ALR 4th 9, and (3) substantial noncompliance of representations made by custodial parent at the original award of custody, 24 Am. Jur.2d Divorce and Separation Section 1011 (1983). This court holds that there are additional circumstances that may be considered affecting the welfare of the children in determining whether there has been a material change of circumstances, including the following (4) violation of court orders re: non-emergency consultation, (5) violation of court orders re: supporting activities that compete with the father's access, (6) deterioration of children's emotional health.
These circumstances will be considered seriatim.
THE ISSUE OF ALIENATION OF THE CHILDREN'S AFFECTIONS OR RESPECT FOR THE NON-CUSTODIAL PARENT BY THE CUSTODIAL PARENT.
The plaintiff has encouraged the children to address the defendant as Mr. Ken. She has also stated to the defendant in the presence of the children that he would be arrested and the children would see him in jail. She has made degrading remarks to the defendant in the presence of the children. She has encouraged the children to be disrespectful to the defendant and to run away from him at the exchange of visitation at McDonalds. She has told the children that she wants the defendant dead or in jail and that she hates the defendant. The children have been told that their mother and her father make the rules and that they do not have to listen to the defendant when they are with him.
In late December 1997 when the guardian-ad-litem spoke to plaintiff regarding the children referring to the defendant as Mr. Ken her response was "what should they call him, Mr. Jerkball?" Many of the exchanges at McDonalds involved the plaintiff encouraging the children to throw stones at the defendant and urging the children not to visit with the defendant. One such exchange was witnessed by Donna Ramos a Department of Children and Families Social Worker who was present at McDonalds on April 23, 1998 as part of an investigation that she was conducting as a result of a referral from the children's school of medical neglect by the plaintiff. That referral turned out to be unsubstantiated. Ms. Ramos had heard that the children were out of control at the McDonald exchanges including hitting and spitting at the defendant and went to McDonalds to observe the exchange. The plaintiff was not aware of the fact that Ms. Ramos would be at McDonalds observing the exchange. Ms. Ramos CT Page 4748 testified during this hearing as follows regarding what she observed on April 23, 1998:
 Q. Do you recall what went on, on that particular occasion?
 A. I saw Mrs. Lane drive up over to Mr. Lane's car. She was screaming something. I couldn't hear it because I was in the car at that point. I got out of the car. I attempted to go over to introduce myself as to who I was. Mrs. Lane continued screaming at me, saying that I wasn't suppose to be there. "The case with DCF was already closed. It was already investigated."
 I tried to explain that the investigation's part was closed, but I was now the new worker who was assigned to the case, and I had been out to her home, and there was no one home, and I needed to come and see the kids and set up an appointment. She was just screaming, and then the children started screaming that Mr. Lane needed to take them to the toy store because their mother said he was going to, and Mr. Lane said, "I'll see if I can do that, but I don't know.
 The children kept screaming, "You better take us because mom said that you're suppose to take us."
 The kids were just absolutely out of control, you know running in and out of the car. Then Mrs. Lane stated that I should be investigating Mr. Lane for sexual abuse of their daughter, and I told her I didn't feel that was appropriate to be talking about in front of the children. If she wanted to consult with me at a later time, then we would do that.
 After about 15 minutes of all this confusion, the children got in the car with Mr. Lane, and I asked Mrs. Lane if I could come out to the home to speak to her, and she said that she was busy. She had something to do that day, and I would need to call her to schedule an appointment to go out there.
The court finds that all of the testimony of Ms. Ramos is credible. What she observed is consistent with what had been going on at the exchanges of the children at McDonalds. The court further finds that the plaintiff's statement that DCF should be investigating the defendant for sexual abuse of the parties CT Page 4749 daughter is false. Judge Steinberg found that there was no basis for that claim as of the date of the trial before him. This court finds that there is no basis for that claim from the date of the trial before Judge Steinberg to the present time.
The bedlam that existed at that exchange at McDonalds as a result of the plaintiff on April 23, 1998 is consistent with the bedlam that existed at prior and subsequent exchanges at McDonalds due to the plaintiff.
The plaintiff further contributed to the bedlam that existed at the McDonald's exchange by video taping many of the exchanges, running into McDonalds to do some of the videotaping and then running into the parking lot to do some of the videotaping. This video taping conduct finally ended when a court order was entered on November 20, 1997 prohibiting the plaintiff from doing any further videotaping or audio taping at the McDonald's exchange. The children have shown aggressive behavior to the defendant since July 18, 1997. This aggressive behavior usually occurs only when the plaintiff is in the presence of the children. The children have been told by the plaintiff that living with the defendant would be a form of punishment. On various occasions the plaintiff would send food with the children when they went to visit with the defendant. She claims this was as a result of the children's being hungry while they are at the defendants. The court finds that the defendant saw to it that the children were properly fed when they are with him. The plaintiff was aware of the fact that on various occasions the defendant would bring the children to the home the defendant's sister, Nancy Rossi. The plaintiff told the children that they should not eat food at the Rossi home because the food at the Rossi home was poisoned. She told the children that a birthday cake that Arthur Rossi made for one of the children was poison and threw it in the garbage. There was absolutely no basis whatsoever for the plaintiff to tell the children that food at the Rossi home was poisoned. The children initially would not eat food at the Rossi home but have since eaten food at that home.
When the children were brought by the plaintiff for treatment at Milford Mental Health, they rarely referred to the defendant as "dad"in the plaintiff's presence, only referring to him as "Mr. Ken" or sometimes other insulting names. When the plaintiff was not present, the children referred to the defendant as "dad" at Milford Mental Health. CT Page 4750
During conversations with the plaintiff at Milford Mental Health, the plaintiff showed an extreme disdain for the defendant and made no attempt to hide this from the children. The children were frequently exposed to and encouraged to mimic this disrespect to their father. The court finds that the plaintiff has undermined and obstructed the defendant's relationship with the children, and the children's respect for him, as a result of which there has been a material change in circumstances since July 18, 1997.
THE ISSUE OF INTERFERENCE OF VISITATION RIGHTS OF THE NON-CUSTODIAL PARENT BY THE CUSTODIAL PARENT.
Judge Steinberg stated in part as follows:
 "Plaintiff mother may not use the children's apparent refusal to participate in their father's access as a basis for non-cooperation. Because mother has repeatedly shown evidence of her control of the children, and because the children have historically enjoyed their time with their father once they experience time with their father, no refusal to participate is to be regarded as the exercise of free will by the children.
 The illness of any child may become the basis for missing an access period only upon advanced presentation of a dated, signed note from a medical doctor specifying the illness and the period of absence required.
 Father is found by this court to be fully capable of providing the children with normal care during minor illness. Mother is directed to advise father of all treatment modalities and to provide all the medication required during the access.
 If the children resist father's access, the cause of the refusal is likely to have been a continuation of mother's historic refusal to cooperate with the visitation orders of the court. The court has found that she is in control of such matters."
From the evidence presented the court finds that the defendant did not have visitation on the following dates which was in violation of his visitation schedule:
1. On Tuesday, August 5, 1997 the defendant sought to CT Page 4751 change the place of pickup or delivery regarding the children as allowed by the Memorandum of Decision of Judge Steinberg under Paragraph 3c which provides: "Father and children are fully empowered to change the place of pickup or delivery." The new location would have been closer to the defendant's place of employment. The defendant notified the plaintiff prior to August 7, 1997 of the new location for pickup and drop off. On Thursday, August 7, 1997 and on Saturday, August 9, 1997, the plaintiff did not show up with the children for the defendant's visitation at the new location. That location was also approximately 5 minutes from the home of the defendant's sister. The plaintiff informed the defendant that she would not agree to any change in the drop off location. The guardian ad litem requested the defendant not require that the location be changed and the defendant agreed to that request.
 2. On Thursday, August 14, 1997, the only child that visited with the defendant was Brandon. Courtney was present at McDonalds but left McDonalds with the plaintiff.
 3. On Saturday, August 16, 1997, the minor child Kenneth was not made available for visitation. Kenneth was at McDonalds with the plaintiff but she would not let him visit claiming that Kenneth was too sick due to surgery.
 4. On Tuesday, August 19, 1997, the plaintiff did not make the minor child Kenneth available for visitation. Kenneth was present at McDonalds but the plaintiff claimed that he was too sick to visit.
 5. On Saturday, August 30, 1997, the minor child Courtney was not brought to McDonalds for visitation due to a vaginal infection.
 6. On Tuesday, September 2, 1997, the minor child Courtney was brought to McDonalds for visitation and never left the plaintiff's vehicle.
7. On Saturday, September 13, 1997, the minor child Courtney was not available for visitation. She was brought to McDonalds by her mother. Courtney never left the plaintiff's vehicle. CT Page 4752
 8. On Tuesday, September 16, 1997, the minor child Brandon was not available for visitation. The plaintiff claimed that Brandon could not visit because he was ill. He was brought to McDonalds by the plaintiff and left with the plaintiff.
 9. On Saturday, September 27, 1997, the plaintiff did not bring Courtney to McDonalds for the defendant's scheduled visitation claiming that Courtney was sick.
 10. On Tuesday, October 7, 1997 none of the children were brought to McDonald's for visitation.
 11. On Thursday, October 9, 1997, the minor child Kenneth was not made available for visitation. The plaintiff claimed that Kenneth was ill and therefore could not visit.
 12. On Tuesday, October 14, 1997, all three children are brought to McDonalds. Courtney left with the plaintiff and did not visit with the defendant.
 13. On Saturday, October 18, 1997, all three children show up at McDonalds with the plaintiff. The plaintiff claimed that Courtney is too sick to visit and only Kenny and Brandon are allowed to visit.
 14. On Tuesday, October 28, 1997, the plaintiff shows up at McDonalds with all three children and leaves McDonalds with all three children thereby preventing any visitation with the defendant.
 15. On Thursday, October 30, 1997, the plaintiff shows-up at McDonalds with all three children and leaves McDonalds with all three children thereby preventing any visitation with the defendant.
 16. On Saturday, November 1, 1997, the plaintiff shows up at McDonalds with all three children and leaves McDonalds with all three children thereby preventing any visitation with the defendant for the weekend.
17. On Tuesday, November 4, 1997, the plaintiff shows up at McDonalds with all three children and leaves McDonalds CT Page 4753 with all three children thereby preventing any visitation with the defendant.
 18. On Thursday, November 6, 1997, the plaintiff shows up at McDonalds with all three children and leaves McDonalds with all three children thereby preventing any visitation with the defendant.
 19. On Saturday, November 15, 1997, the minor child Courtney was not made available for visitation. The plaintiff claimed that Courtney was too ill to visit.
 20. On Tuesday, November 18, 1997, the plaintiff arrives at McDonalds with all three children. Courtney left with the plaintiff and did not visit with the defendant.
 21. On Thursday, December 11, 1997, there was no visitation with Courtney. The plaintiff claimed that Courtney was too ill to visit.
 22. On Tuesday, December 30, 1997, Courtney is not made available for visitation. The plaintiff claims that the reason for this is due to Courtney's surgery on her lip.
 23. On Thursday, January 1, 1998, the plaintiff arrives with all three children at McDonalds. Courtney remained in the plaintiff's vehicle and does not visit with the defendant. The defendant filed a motion for contempt dated January 7, 1998 coded #306 regarding his failure to have visitation with Courtney on December 30, 1997 and January 1, 1998.
 24. On Tuesday, January 13, 1998, the plaintiff arrives with all three children at McDonalds and leaves with all three children claiming that one child has to go to the doctor. The defendant filed a motion for contempt dated January 14, 1998 coded #307 regarding his failure to have visitation with the three children on this date.
25. On Thursday, January 15, 1998, none of the children were made available for visitation. The plaintiff claimed that all three children are sick. The defendant filed a motion for contempt dated January 16, 1998 coded #313 regarding his failure to have visitation with the three children on this date. CT Page 4754
 26. On Tuesday, February 17, 1998, the minor child Courtney was not made available for visitation due to illness. The defendant filed a motion for contempt dated February 18, 1998 coded #316 regarding his failure to have visitation with Courtney on this date.
 27. On Thursday, March 26, 1998, the plaintiff did not show up at McDonalds and the children were therefore not made available for visitation. The defendant filed a motion for contempt dated March 27, 1998 coded #321 regarding his failure to have visitation with the three children on this date.
 28. On Tuesday, March 31, 1998, the plaintiff showed up at McDonalds with all three children. Brandon did not go with the defendant and he stayed with the plaintiff. The defendant filed a motion for contempt dated April 1, 1998 coded #322 regarding his failure to have visitation with the minor child Brandon on this date.
 29. On Thursday, April 2, 1998, the minor child Brandon was not brought to McDonalds for visitation. The defendant filed a motion for contempt dated April 3, 1998 coded #323 regarding his failure to have visitation with the minor child Brandon on this date.
 30. On Thursday, May 7, 1998, the plaintiff was at McDonalds with all three children. None of the children went with the defendant for visitation.
The court finds that on those occasions that the plaintiff withheld visitation of one or more of the children on the grounds of illness that such a reason was not valid. The defendant was perfectly capable for caring for any of the children during any time that they were ill. The acts of the plaintiff in withholding children on the grounds of illness was a wilful violation on her part. From all the evidence presented to this court, this court agrees with the finding previously made by Judge Steinberg that: "father is found by this court to be fully capable of providing the children with normal care during minor illness." All of the illnesses in question were in fact minor illnesses. Judge Steinberg also ordered that the illness of any child may become the basis for missing an access period only upon advanced presentation of a dated, signed note from a medical doctor CT Page 4755 specifying the illness and the period of absence required. At no time was a dated signed note from a doctor provided in advance regarding an illness that formed the basis for missing an access period.
As a result of those occasions in which the plaintiff withheld visitation on the grounds of illness the court finds that there has been a material change in circumstances since July 18, 1997.
This court also agrees with the finding of Judge Steinberg that "if the children resist father's access, the cause of the refusal is likely to be a continuation of mother's historic refusal to cooperate with the visitation orders of the court. The court has found that she is in control of such matters."
As a result of those occasions in which the plaintiff has withheld visitation as a result of the alleged children's resistance to father's access, the court finds that there has been a material change in circumstances since July 18, 1997.
The court, Munro, J., held a hearing regarding the issue of the minor children not being available for visitation on May 19, 1998, May 21, 1998, May 26, 1998, May 28, 1998, June 2, 1998, June 4, 1998 and the weekend of May 30 and May 31, 1998. The plaintiff was held in contempt and makeup visitation was ordered.
This court heard from numerous witnesses regarding the same claims heard by Judge Munro. Neither party sought to invoke the rule of Borkowski v. Borkowski, 228 Conn. 729 (1994) where the court at page 738-739 stated in part as follows:
 Applicable to dissolution actions as well as to other kinds of litigation, is the principle that an adjudication by a court having jurisdiction of the subject matter and the parties is final and conclusive not only as to matters actually determined, but as to matters which the parties might have litigated as incident thereto and coming within the legitimate purview of the subject matter of the action. . . . A court, having performed its function of ruling upon a controversy, cannot be taken over by the litigants for the continued readjudication and reconsideration of their affairs.
This court is aware of the fact Borkowski involved a motion CT Page 4756 for modification of alimony and not a motion to modify custody. Since the Borkowski rule cited above was not sought to be enforced by any party, this court did again hear evidence and testimony regarding the same issues that were raised before Judge Munro and decided on June 9, 1998.
 KENNETH — SHOULDER INJURY
The Department of Children and Families wrote to the plaintiff by letter dated May 4, 1998 as follows:
 "Due to the recommendation of the Yale Child Study Center Consultant, your case with DCF has been closed. A consultant believes that you case is being handled by the proper agency, family court, as it is a custody case. If you have any questions please feel free to contact me.
By letter dated May 6, 1998 the plaintiff wrote to Donna Ramos of the Department of Children and Families. In that letter the plaintiff stated as follows:
"Dear Ms. Ramos:
 On May 5, 1998, Ken returned the children from visitation at 7:00 p. m. at McDonalds.
 Kenny was crying hysterically. He reported that his father had punched him in the shoulder. Brandon and Kenny were the only children present at the incident. (Courtney was in Brownies.)
 I took Kenny directly to Milford Police station. Both Kenny and Brandon were interviewed by an officer, separately as to the incident.
 The police officer examined Kenny, noted the marks, and interviewed him about them. The officer recommended that if Kenny continued to complain to take him for an examination by a doctor.
Kenny continued to be very upset about the entire matter after we returned home. He continued to complain his shoulder hurt even after his shower and awoke complaining. CT Page 4757
 I took him to Milford Hospital on May 6, 1998, and he was examined regarding the injury caused by his father. I am attaching the hospital report regarding the physician's diagnosis of the deep bruise contusion of the area, and recommendation he not participate in gym for 1 week.
 Both Kenny and Brandon are available to speak with you as to this incident, at a time convenient to your schedule.
 Thank you, Regina
 *This is the second incident regarding physical abuse by the father, and the children returning from visitation with marks on them, caused by their father."
The plaintiff went to the Milford Police Department on May 5, 1998. The Milford Police interviewed both the plaintiff and the minor child Kenneth. The minor child stated to the police that his father had grabbed him by the shoulder very hard and stated that his father had slapped him twice while they were at the Margaret Eagen Center for his sister's brownie meeting. All three children had been brought to the police station by the plaintiff. All three children were adamant at the police station about having their father arrested.
A diagnosis was made of the minor child Kenneth at the Milford Hospital on May 6, 1998 of a deep bruise (contusion).
DCF made an unannounced home visit to the plaintiff's residence on May 6, 1998 that included an interview with the minor child Kenneth privately in his living room. Kenneth stated that he, his father and younger brother Brandon went to get his sister Courtney on the second floor of the Egan Center. Kenneth stated that he suddenly felt his father grab him by the right shoulder and pull him into the men's lavatory near by. He further stated that while in the lavatory his father proceeded to punch him on his head, face and shoulder with knuckles of his fist five times. Kenneth denied any improper behavior on his part to warrant any disciplinary action. He insisted that he had done nothing wrong and could not offer any reason for father's violent conduct. The DCF worker was able to observe one red abrasion, (scrape) below the right shoulder and a linear red mark which CT Page 4758 appeared consistent with a possible grab on the shoulder.
The defendant was interviewed by the Milford Police Department and by DCF regarding the May 5, 1998 incident at the Egan Center. He accurately described to both the Milford Police Department and DCF the facts leading up to the injury to Kenneth's right shoulder. The defendant stated that Kenneth was acting up in the Egan Center building. The child was spitting saliva into his hands and then wiping his hands on his father. The defendant ushered the boy into the nearby lavatory and verbally admonished him. The defendant stated that he did not slap or punch his son. The defendant did report grabbing his son by his upper arm/shoulder to steer him into the lavatory. He did not intend nor was he aware that the child sustained any bruise or injury as a result of his actions. The court finds that the version of the incident that occurred on May 5, 1998 as stated by the defendant is the correct version. The court finds that at no time during that incident did the defendant punch Kenneth on his head, face or shoulder. Milford Police concluded that this incident was more in the line of parental discipline and no criminal action was sought against the defendant by Milford Police. The DCF investigation unit reopened the case and substantiated abuse by father. DCF takes the position that its policy requires that whenever there has been any form of physical injury that a finding of abuse is mandatory.
§ 46b-120 defines abuse as follows:
 (c) "Abuse" means a child or youth (A) has had physical injury or injuries inflicted upon him other than by accidental means or (B) has injuries which are at variance with the history given of them, or (c) is in a condition which is the result of maltreatment, such as, but not limited to, malnutrition, sexual molestation, or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment.
From all the evidence presented to this court, this court finds that the injuries to the child's shoulder were accidentally inflicted by the defendant and are not at variance with the history of the injuries given by the defendant. This court therefore finds that the child was not "abused" by the defendant within the statutory definition of abuse. The court further finds that the manner in which the defendant was seeking to correct the actions of his son Kenneth constituted proper parental CT Page 4759 discipline. DCF decided to continue to follow the advise of the consultant from Yale Child Study Center and close the case for treatment services for lack of cooperation on the part of the family and because the major issues were being handled by family court.
BRANDON — EYE INJURY
On March 11, 1998, DCF received a phone call from Stephen Link. He stated that the defendant had the children the previous evening and when they returned home Brandon had a black eye. Mr. Link stated that Brandon was brought to the hospital and he also called the police in West Haven. He further stated that the father's nephew named Angelo age 16 punched Brandon in the eye.
On March 11, 1998, the plaintiff and the minor child Brandon came into the West Haven Police Headquarters to make a complaint regarding Brandon being assaulted. The plaintiff stated that her son Brandon was visiting with his father and had gone to the home of his father's sister Nancy Rossi on March 10, 1998. While at that home he stated that he was in a room alone with his brother Kenny when his cousin Angelo Rossi age 15 came over to him an punched him in the left eye with his fist for no reason. From the evidence presented the court finds that at no time was Angelo Rossi and the Lane children left alone without being supervised by an adult. The two Rossi children get along well with the Lane Children. When Brandon left the Rossi home on March 10, 1998 at approximately 6:30 p. m. he did not complain of any pain or injury to his face and did not have a black eye. The court finds that Angelo Rossi did not hit his cousin Brandon.
This court finds that the wilful violations by the plaintiff regarding the defendant's visitation rights on May 19, 1998, May 21, 1998, May 26, 1998, May 28, 1998, June 2, 1998 and June 4, 1998 constitutes a material change in circumstances since July 18, 1997.
Mary DePaola of Family Relations found that at a visit to the plaintiff's home that the children appeared programmed to present to her individual recitations commencing with a list of faults and neglects of "Mr. Lane" and concluding that they wished not visit with their father further at his home. During the children's recitations, the plaintiff smiled and nodded approvingly. Eleanor Rosa, the school nurse also found that Kenneth was not an accurate reporter regarding his claim of CT Page 4760 sexual abuse on October 13, 1998. Statements that were made by Kenneth to the school nurse did not come from him but had been told to him. When the children were spoken to at school regarding their father, their answers were rehearsed and were being repeated by them. The children were also interviewed by a DCF worker on April 29, 1998 at the plaintiff's residence. On that occasion the children all sounded as though their answers were rehearsed and that they had been told what to say. When Brandon was seen at Milford Mental Health on December 2, 1997, Sylvia Stuart found that it was difficult to differentiate between Brandon's own ideas and feelings and those of mother's and grandparent's. Sylvia Stuart also noted on January 24, 1998 that she could not tell if Courtney's feelings as expressed were that of herself or that of others. This court also finds that the children have been put in the middle of a conflict between the parents. They are not accurate reporters regarding their accusations of physical abuse or sexual abuse or medical neglect.
Prior to being brought to the Milford Hospital on May 18, 1998 Kenneth was at the office of Mrs. Rosa the school nurse. He told her that his father had put ring worm on his shoulder and his mother had told him so. Ring worm is not a worm infection but an infection caused by a fungus. When the school nurse examined Kenneth she did not find any bruise on his back. When he was seen by Mrs. Rosa he did not have any complaints about being hurt other than his complaint of ring worm on his shoulder.
On May 18, 1998, Kenneth was brought to the Milford Hospital where he was examined by Dr. Reed because of a bruise to his back. He had been visiting with his father the previous day and stated that his father had pinched him all over the chest wall, especially along the left nipple and along the right anterior mid posterior anxillary line. There were no traumatic marks noted in the chest area. His penis and scrotum were unremarkable and there were no tears to his anus. The only finding was of a black and blue, more bluish bruise area on his back the size of a little smaller of a half inch in diameter. It was in the area of the left part of his back and the back of his arm pit and maybe a little lower than that and right on the back. Dr. Reed reported the matter to DCF. From the evidence presented this court finds that the defendant did not pinch Kenneth over the chest wall and did not cause the bruised area to his back during the visit on May 16 and May 17, 1998.
THE ISSUE OF SUBSTANTIAL NONCOMPLIANCE OF REPRESENTATIONS MADE BY CT Page 4761 CUSTODIAL PARENT BY THE ORIGINAL AWARD OF CUSTODY.
Judge Steinberg made the following findings: "This court views mother as a danger to the best interests of the three children if her conduct does not change. The relentless attack, by mother and her parents, on the father of these children, and his family, if it is continued, is likely to do lasting damage to the young Lanes. . . . Mother has pledged to this court that she would enter counseling. Without such a material commitment, given the facts found in this case, the court would not have awarded mother custody. Her serious and consistent participation, her resultant changed behavior, her commitment to further change and the independence and high professional quality of the practitioner she hires are all particularly meaningful."
The plaintiff was in therapy at Catholic Family Services on the following dates: August 15, 1997, September 12, 1997, September 16, 1997, September 23, 1997, September 30, 1997, October 15, 1997, November 18, 1997, December 23, 1997, January 9, 1998, January 19, 1998, February 2, 1998, February 26, 1998 and April 9, 1998. The plaintiff testified that she was also in treatment at Milford Mental Health. While it is true that both the plaintiff and the defendant attended some of the sessions of the children at Milford Mental Health, nevertheless neither the plaintiff or the defendant were ever in treatment at Milford Mental Health. The plaintiff's testimony that she was in treatment at Milford Mental Health is false. The plaintiff also testified that she was in treatment with the Reverend Bruce Page. That testimony is also false.
The children have been in psychotherapy with the Reverend Dr. Bruce Page since July 18, 1998. The plaintiff also testified that counseling with the Reverend Dr. Bruce Page is pastoral only. That testimony was false. The Reverend Dr. Bruce Page testified in part as follows:
CROSS-EXAMINATION BY MR. TROWBRIDGE:
Q Dr. Page, would you just identify the members of the Lane family to whom you are providing therapy?
A. Courtney, Brandon and Kenny.
CROSS-EXAMINATION BY MR. LANE: CT Page 4762
Q. As for the question that was just asked. Do you see Mrs. Lane for counseling?
A. I think it would be fair to say that I provide some counseling to Mrs. Lane as the parent of the children. In other words, I do see her at each visit and usually take a few minutes to chat with her after the children's visits.
CROSS-EXAMINATION BY MR. TROWBRIDGE:
Q. Dr. Page, are you providing therapy to Mrs. Lane?
A. No, I'm not.
CROSS-EXAMINATION BY MR. PARLEY:
Q. When you talk with Mrs. Lane, the counseling on the phone, you are talking to her at those points in time that she's your patient in the same way the children are your patients?
A. No. I would have to say that I consider the children the patients, the clients in my treatment, but obviously, in working with children, a cordial and constructive relationship with the parents is very important, and I feel as if we have that.
The court finds that the plaintiff has complied with the pledge that she made to Judge Steinberg to enter counseling. The plaintiff did not pledge that her behavior would change as a result of participating in counseling. The court therefore finds that there has been substantial compliance with the pledge of the plaintiff that she would enter counseling, and therefore there is not a material change in circumstances regarding her representation concerning her counseling.
Judge Steinberg also found that "mother has pledged to this court that, for one hour each week, all three of the children would enter counseling in various groupings as Dr. Alan Shulick would, from time to time, recommend. On November 30, 1998 the parties entered into the following stipulation:
 "The parties agree that the following is a reasonable outline of the events concerning the children's counseling:
1. Following the entry of the decree, the plaintiff CT Page 4763 re-initiated treatment with Dr. Shulick.
 2. Dr. Shulick suspended treatment in August and September 1997 due to a billing and payment problem involving both parties.
 3. Dr. Shulick then saw the children through October 1997, when he terminated because of a dispute with the plaintiff over payments from her, for time he spent with the defendant.
 4. The above information was testified to by the plaintiff, the defendant, and Dr. Shulick.
 5. The plaintiff then made contact with Milford Mental Health Center . . ." ". . . and the children were seen by Sylvia Stuart until late February, early March 1998.
 6. In addition to the testimony of the plaintiff, Miss Stuart, and Christine Lidz, the dates of application and treatment appear in the Milford Mental Health Center records submitted as exhibits in the trial.
 7. The plaintiff stopped the treatment at Milford Mental Health Center after Sylvia Stuart left because of a dispute she had with Milford Mental Health Center regarding an evaluation of her. This was in March 1998.
 8. The plaintiff then sought to enroll the children in Clifford Beers, but declined to proceed when she learned the person assigned was only a student.
 9. In June 1998, the plaintiff arranged for the children to start pastoral counseling with Bruce Page.
 10. The information in the preceding three paragraphs was testified by the plaintiff, including the submission of several documents as exhibits.
 11. The parties are not in agreement as to whether this history was a reasonable compliance with any orders of Judge Steinberg or the intention expressed in Judge Steinberg's decision. Neither will be calling further witnesses."
CT Page 4764 The plaintiff contacted Milford Mental Health on October 15, 1997 to resume therapy for the children. During that phone call she claimed that Kenneth was threatening suicide. Kenneth was in treatment from October 22, 1997 to March 4, 1998. Courtney was in treatment from November 19, 1997 to March 10, 1998. Brandon was in treatment from November 19, 1997 to March 17, 1998. The plaintiff also had the children in therapy at Clifford Beers in April 1998. They have been in therapy with Dr. Bruce Page since June 1998. She also brought the children to the Susan B. Anthony Project for children for counseling for self-protection from physically abusive family members and how to develop defense. strategies. The defendant still seeks to dispute the reason that the children's therapy with Dr. Shulick was terminated. Regardless of the reason for termination, the court finds that there has been substantial compliance by the plaintiff with the representation that she made regarding keeping the children in counseling and therefore does not find that there has been a material change in circumstances regarding that representation.
The minor child Kenneth was seen at Milford Mental Health on November 12, 1997. On that date he denied ever having threatened to commit suicide and denied ever having been subjected to any sexual abuse by the defendant. The plaintiff has claimed that Kenneth had threatened suicide rather than live with the defendant. The Milford Mental Health record for January 7, 1998 regarding Kenneth states in part as follows:
"Mom has claimed that he threatened suicide, but he denies this." The plaintiff also told Catholic Family Services on September 12, 1997 that she was upset because Kenneth had threatened suicide if he had to go on visitation with his father. On September 16, 1997 she again discussed her fears at Catholic Family Services around her claim that Kenneth had threatened suicide if he had to sleep over at his father's house. In the spring of 1998 the plaintiff alleged that there would be bad news because the children were threatening suicide if visits with the defendant continued. The court finds that all of the claims of the plaintiff involving suicide regarding the children are false.
The history intake at Milford Mental Health regarding Brandon on November 19, 1997, states as follows:
 "Parents involved in difficult divorce. Mom seems to have inappropriately involved children."
CT Page 4765 The court finds that the plaintiff has inappropriately involved the children post judgment. Sylvia Stuart of Milford Mental Health recommended that the plaintiff have a psychiatric evaluation in November, 1997 and she had agreed to it. On January 28, 1998 when Sylvia Stuart of Milford Mental Health spoke to the plaintiff and reminded her of her agreement to have a psychiatric evaluation, the plaintiff denied to Sylvia Stuart having agreed to a psychiatric evaluation. On March 4, 1998 Sylvia Stuart again spoke to the plaintiff regarding the Milford Mental Health Clinic recommendation for a psychiatric evaluation for her. Her response was angry and aggressive — denying it had ever been recommended. On March 17, 1998 Milford Mental Health wrote to the plaintiff concerning concerns that Milford Mental Health had regarding the children and the previous recommendation to the plaintiff that she obtain a psychiatric evaluation and again making the recommendation that the plaintiff have a psychiatric evaluation in order to help in the treatment of the children and further assessment of the family environment. Milford Mental Health again wrote to the plaintiff by letter dated March 25, 1998 stating that in view of the fact that Sylvia Stuart was leaving that Milford Mental Health would not reassign the Lane Children for psycho therapy until the plaintiff has undergone a psychiatric evaluation either at Milford Mental Health Clinic or elsewhere and that the plaintiff provide Milford Mental Health Clinic with a release of information to obtain a copy of her evaluation and permission to discuss her evaluation and treatment recommendation with her consulting psychiatrist. The plaintiff was informed that if this material was not receive by April 30, 1998 that Milford Mental Health would assume that the plaintiff was no longer interested in pursuing treatment for her children at Milford Mental Health Clinic and that Milford Mental Health would close its case on the children. Milford Mental Health believed that it was difficult to proceed with treatment for the children without a full assessment of the influences under which the children lived which required a psychiatric evaluation of the plaintiff. The plaintiff's testimony that she was never asked to have a psychiatric evaluation since July 18, 1997 is simply false.
Judge Steinberg also ordered that each party have reasonable access to the children while with the other parent by mail and telephone during reasonable hours of the day and early evening. The defendant has complied with this requirement. While the plaintiff has not fully complied with this requirement regarding telephone access by the defendant, nevertheless the court does not find that there has been a material change in circumstances CT Page 4766 regarding that failure on her part.
THE ISSUE OF VIOLATION OF COURT ORDERS REGARDING NON EMERGENCY CONSULTATION.
Judge Steinberg also made the following order: "Plaintiff mother shall consult with defendant father regarding all non-emergency health care . . ."
The plaintiff takes the position that her requirement to consult with the defendant regarding all non-emergency healthcare only means that she has to tell him what has already transpired.
"Consult" is defined in Webster's Third International Dictionary as "to ask advice of; seek the opinion of." "Consult" is defined in the Random House Dictionary as "to seek advice or information from." Merely informing the defendant of medical procedures that have already taken place does not constitute consulting with him.
On or about August 11, 1997 the minor child Kenneth had non-emergency tonsillectomy. The defendant was made aware of the pending tonsillectomy from the surgeon. However the plaintiff never consulted with the defendant regarding the surgery. The minor child Courtney had non-emergency lip surgery on or about December 30, 1997. The plaintiff did not consult with the defendant prior to Courtney having her lip surgery and he did not learn about it until after the surgery had taken place.
The plaintiff did not consult with the defendant ahead of time before having the children commence counseling with the Reverend Dr. Page in June 1998, or before she had the children commence counseling at Milford Mental Health. The first information that the defendant had that the children were in counseling with Dr. Bruce Page was during the trial on October 30, 1998.
The minor child Kenneth has been treated for asthma by Dr. Choa. The defendant did not learn of that treatment until a few months after it commenced. The defendant repeatedly filed motions regarding the plaintiff's failure to consult with him regarding non-emergency health care. He filed a motion dated November 17, 1997 coded #293 regarding the failure of the plaintiff to consult with him concerning the August 1997 tonsillectomy for the minor child Kenneth. He filed a motion for contempt dated January 7, CT Page 4767 1998 coded #306 regarding the failure of the plaintiff to consult with him before Courtney had lip surgery on December 30, 1997. He filed a motion for contempt dated January 7, 1998 coded #306 for failure of the plaintiff to consult with him regarding the surgery that Courtney had on December 30, 1997 for her lip. He filed a contempt motion against the plaintiff dated April 1, 1998 coded #322 for failure to consult with him regarding the minor child Kenneth having teeth removed on March 20, 1998. The plaintiff also failed to consult with the defendant prior to Courtney having surgery on her nose in May 1998. She did not consult with the defendant prior to having the children commence therapy at Clifford Beers in April 1998.
The court finds that the failure of the plaintiff to comply with the court order regarding consulting with the defendant concerning all non-emergency healthcare constitutes a material change in circumstances since July 18, 1997.
THE ISSUE OF VIOLATION OF COURT ORDERS RE: SUPPORTING ACTIVITIES THAT COMPETE WITH THE FATHER'S ACCESS
Judge Steinberg entered the following order: "Neither plaintiff mother nor her family are to offer, encourage or support any activities or programs that would compete in any way with father's access. Father's access as set forth herein shall take precedence over all other plans or arrangements involving the children." On September 30, 1997 the plaintiff informed the defendant that Courtney was being signed up by the plaintiff for membership in the Brownies. The plaintiff told Courtney to ask the defendant if it was O.K. if she participated in Brownies that would take place during the defendant's visitation. Courtney informed the plaintiff that there was no response from the defendant. The plaintiff then enrolled Courtney in Brownies before the defendant gave his consent. He subsequently gave his consent because he felt that girl scouts is a rewarding activity that teaches children values, character and socialization skills. The plaintiff justifies her actions in part by saying that if the defendant had not ultimately given permission that she would have then withdrawn Courtney from Brownies and told her that it was between her and the defendant. The plaintiff in writing to the defendant by letter dated September 30, 1997 stated in part as follows regarding Courtney attending Brownies:
"She must be accompanied by her mother during meetings." CT Page 4768
That statement is not true. Further, the Brownie meetings did interfere with the defendant's visitation with Courtney. The court finds that the action of the plaintiff of offering, encouraging and supporting the Brownie activity for Courtney which competed with the father's access constitutes a material change in circumstances since July 18, 1997.
THE ISSUE OF DETERIORATION OF CHILDREN'S EMOTIONAL HEALTH
The Family Relation Counselor contacted Mrs. Carroll at the children's school as a result of the plaintiff claiming that the family relation's report was wrong regarding the children's emotional and educational status. Ms. DePaola talked to the school principal Mrs. Carroll. As of April 1998, the principal at the children's school confirmed with the family relations officer that the children's emotional state was deteriorating. The concern regarding the children's emotional state continued to exist as of November 6, 1998. Kenneth's social behavior and self-control had deteriorated. Kenneth was isolating himself from other children. He would seldom smile. Courtney was not working to her potential. Courtney was stressed regarding both Brandon and Kenneth. Brandon was appearing at the school nurses office regularly with minor complaints. He was stuttering regularly. In addition the numerous false accusations made by the children against the defendant, against the plaintiff, and against Angelo Rossi are all further evidence of the deterioration of the children's emotional health. The court finds that there has been a material change in circumstances since July 18, 1997 as a result of the deterioration of the children's emotional health.
In summary this court finds that there has been a material change in circumstance since July 18, 1997 for each of the following reasons:
 1. The plaintiff has undermined and obstructed the defendant's relationship with the children since July 18, 1997;
 2. The plaintiff has interfered with the visitation rights of the defendant since July 18, 1997;
 3. The plaintiff has failed to consult with the defendant non-emergency health care since July 18, 1997;
4. The plaintiff has violated court orders by supporting an activity that competed with the defendant's access to Courtney CT Page 4769 since July 18, 1997;
 5. The children's emotional health has deteriorated since July 18, 1997.
The remaining issue is whether it is in the best interest of the children to modify custody. In deciding the custody and visitation issues, a court must be guided by what is in the best interest of each child. The court finds the following additional facts.
In addition to the allegations previously referred to, there has been a relentless attack by the plaintiff and her parents against the defendant and his family since July 18, 1997 consisting of the following:
On July 23, 1997, the plaintiff went to the police headquarters of the Milford Police Department claiming on July 22, 1997 she was threatened by the defendant's brother-in-law Arthur Rossi in the parking lot of the McDonald's at 439 Bridgeport Ave., Milford, Connecticut. She claimed that her brother-in-law Arthur Rossi became verbally abusive at the parking lot and was yelling at her and stated to her that he was going to kill her. This claimed conduct against Arthur Rossi came four days after Judge Steinberg in his decision found that "the unverified claims against the Rossi family, defendant's sister and husband, and their children are remarkable for their creativity and their wide range." She requested the arrest of Arthur Rossi for threatening her. She had already gone to the Milford Superior Court to obtain an application for relief from abuse regarding Arthur Rossi but was told that she is no longer a relative and therefore the order could not be issued. The prosecutor determined that the case should be handled civilly and criminal charges were not pursued. From the evidence presented to this court, the court finds that the charges by the plaintiff against her brother-in-law Arthur Rossi were false. The court finds that he did not become verbally abusive to her and did not state that he was going to kill her.
On August 5, 1997 the plaintiff again went to the Milford Police Department claiming that while at the McDonald's parking lot to take custody of the children from the defendant that she observed Courtney and Brandon running around unsupervised in the parking lot and observed the defendant's grabbing the minor child Kenneth, Jr. by the arms in a rough and unacceptable manor. The CT Page 4770 Milford Police contacted DCF and advised DCF of the child abuse complaint made by Regina Lane against the defendant. The court finds that while at the McDonald's exchange on August 5, 1997 Kenneth had grabbed the defendant around his neck from behind and began slapping the defendant in his head. The defendant turned to try to control Kenneth and while doing so Brandon came over and stepped on the defendant's foot and began kicking the defendant. Brandon later tried to run to the parking lot and the defendant grabbed Brandon by the shirt in order to stop him. DCF and the Milford Police determined that the incident reported by the plaintiff on August 5, 1997 was unfounded.
The plaintiff wrote to Milford Mental Health by letter dated March 21, 1998, which included an alleged chronology of events. In that alleged chronology of events, she claimed that on August 5, 1997 that:
 "There is a crisis situation regarding physical abuse by the father in disciplining the children."
The court finds that there was no physical abuse by the father in disciplining the children on August 5, 1997. The claim of the plaintiff in her letter dated March 21, 1998 to Milford Mental Health of physical abuse on August 5, 1997 came within 18 days after Judge Steinberg's memorandum of decision of July 18, 1997, in which he stated in part as follows:
 "The court is disturbed by an undercurrent, that often rises to flood stages in cases as adversarial as this one, that father somehow, in some way, may have been physically inappropriate with Courtney. The court rejects the innuendos and finds no credible evidence that such incidents occurred . . . The unverified claims against the Rossi family, father's sister and husband, and their children are remarkable for their creativity and their wide range. She refuses to accept court adjudications as conclusions of her claims, raising them again and again after a court rejects her position."
The plaintiff's first appointment with Catholic Family Services was on August 15, 1997. On that date she claimed that the defendant was heavy into pornography and child pornography. She added that her ex-sister-in-law took nude photos of her son and the twins in the bathtub and the defendant had a frontal nude picture of her daughter with her crotch exposed, legs spread CT Page 4771 apart. On August 25, 1997 Catholic Family Services contacted DCF and reported suspicions of child sexual abuse regarding the plaintiff's children. DCF contacted the Milford Police Department by fax on August 26, 1997 regarding the same allegations the plaintiff had made to Catholic Family Services on August 15, 1997. The Milford Police Department met with the plaintiff and she related to them the same information she had given to Catholic Family Services on August 15, 1997. She stated that she had possession of the nude photos of her daughter as well as a picture of her daughter and Brandon in the bathtub at an early age. She told the Milford Police that the nude photos occurred several years ago when they were living in Milford, Connecticut. The court notes that the incident in question would have occurred prior to the judgment dissolving the marriage between the parties. On August 27, 1997 the Milford Police Officer investigated these allegations and spoke to a DCF case worker. The DCF case worker informed the Milford Police Officer that a case was investigated by DCF last year and when the case worker viewed the photographs they were deemed then as being non-pornographic. The Milford Police subsequently met with the plaintiff and with the plaintiff's mother at police headquarters. When informed by the Milford Police that her complaint, of August 5, 1997 was unfounded and that the defendant had used proper parental discipline, the plaintiff became very upset. The plaintiff was asked by the police if she had the photographs and videos in regard to the pornography complaint. The plaintiff responded by saying "well, since the Milford Police Department doesn't want to take my complaint, I'll have to turn the tapes over to DCF." The Milford police also spoke to the plaintiff's mother. Her mother expressed concern with regard to the unsupervised visitation that exists regarding the three children and the defendant. There is a conflict in testimony as to whether it was the plaintiff or her mother who showed the police the photographs of Courtney sitting on a small potty seat as well as a photograph of her being in the bathtub with her brother. The court finds that it was the plaintiff's mother who showed those photographs to the police. The plaintiff's mother viewed those photographs as being inappropriate. The police viewed the photographs and saw them to be of a non-pornographic nature.
There is no credible evidence that the photographs of Courtney was of a pornographic nature. There is no credible evidence that the defendant had any child pornographic videos.
On September 2, 1997, DCF received a phone call from Stephen CT Page 4772 Link the maternal grandfather who stated that Courtney had told him that the defendant had touched her private part. Mr. Link went on to say that the children should not be having visitations with the defendant as they are not beneficial to the mental health of the children. The court finds that the claim by Stephen Link on September 2, 1997 that the defendant had touched Courtney's private part is false. This claim was raised less than 7 weeks after Judge Steinberg rejected a similar claim that the defendant had been physically inappropriate to Courtney.
The plaintiff met with Catholic Family Services on September 12, 1997 thanking Catholic Family Services for reporting her August 5, 1997 parking lot complaint against the defendant to DCF and stating that Catholic Family Services was the first to report to DCF. The plaintiff knew the Milford police had previously reported to DCF the plaintiff's complaint regarding the August 5, 1997 incident. A letter from the plaintiff dated August 6, 1997 to Attorney Parley and Attorney Hutchinson referred to the August 5, 1997 incident in stating that the children were taken to Milford Police Department and the officer immediately reported the matter to DCF and she was informed that a DCF person would come to her house probably that evening. The plaintiff's claim to Catholic Family Services on September 12, 1997 that Catholic Family Services was the first to report the claimed August 5, 1997 abuse to DCF was a lie.
The plaintiff also complained to Catholic Family Services on September 12, 1997 that the defendant was physically, verbally and sexually abusive to the children. That claim is false. On September 17, 1997 a DCF employee notified Catholic Family Services that there was not enough evidence to keep the case open. The DCF employee felt that the plaintiff may be embellishing the situation due to the hatred that she feels towards her ex-husband.
A referral was received by DCF on December 17, 1997, from the maternal grandfather alleging medical, emotional and physical neglect by the father while the children were visiting. DCF correctly found that the allegations were not substantiated. DCF further found that professionals have never confirmed any physical abuse of the children. East Shore Pediatricians treated the children from July 5, 1994 to October 17, 1997. A letter was written by East Shore Pediatricians to DCF dated December 26, 1997 that stated in part:
CT Page 4773 "There has never been any evidence of physical abuse by either parent."
DCF found that the defendant appeared to be trying to maintain a decent relationship with his children. The maternal grandfather also stated that the children were not properly fed when they visit with the father. He also reported that father had a history of substance abuse. DCF determined that records indicated that father submitted to a substance abuse evaluation and was found that he did not have a substance abuse problem. There is no credible evidence that the children were not being properly fed by the defendant during visitation. There is no credible evidence of any improper corporal punishment being inflicted upon any of the children by the defendant. There is no credible evidence of any substance abuse by the defendant. There is no credible evidence that the defendant was engaged in medical, emotional or physical neglect of the children during visitation.
On March 12, 1998, DCF was contacted by the children's school nurse indicating that Kenneth has been sent to school wheezing and coughing. Kenneth stated that his doctor told him to use his inhaler four times a day. When asked on Monday if the plaintiff had given him his medication he stated that she had not. He was in school on March 12, 1998 coughing. Also, Courtney came to the health room on March 12, 1998 complaining of a sore throat and headache. She told the school nurse that she had strep throat and medicine for it. On March 9, 1998 Brandon came to the nurse stating that he had strep throat and did not have any medication. The claims by the children that they were not given proper medication were not true.
On March 13, 1998 Stephen Link again contacted DCF by letter dated March 13, 1998 alleging that the defendant has never taken the children to a medical visit, has failed to administer routine medication during times of illnesses during his visitation, has failed to follow medical notes regarding care and dietary requirement, has failed to protect Kenny (asmatic) by continually bringing him into environments where there is a cat (exacerbating his asthma attacks documented in emergency hospitalization and clinic visits directly following visitation periods with the father.) From the evidence presented the court finds that all of those allegations are false.
Courtney was seen by Sylvia Stuart at Milford Mental Health on March 17, 1998 with Brandon also present. Courtney said "daddy CT Page 4774 signed a paper and lied," claiming that her maternal grandfather had shown her a paper regarding the plaintiff's brother hitting Brandon. Discussion of this seemed to create extreme stress for Brandon. Courtney then reacted by saying that Dad had touched her "privates" and hit her. Uncertain about hitting she dropped it quickly. The therapist tried to have her elaborate on touching. Courtney claimed that the defendant picked her up by holding her between her legs. Sylvia Stuart did not report this to DCF. The plaintiff's father reported Courtney's claim to DCF.
Section 17a-101a provides in part as follows:
 Any mandated reporter, as defined in Section 17a-101, who in his professional capacity has reasonable cause to suspect or believe that any child under the age of eighteen years has been abused, as defined in Section 46b-120, has had non-accidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon him by a person responsible for such child's heath, welfare or care or by a person given access to such child by such responsible person, or has been neglected as defined in Section 46b-120, shall report or cause a report to be made in accordance with the provisions of sections 17a-101b to 17a-101d, inclusive. (Emphasis provided).
Sylvia Stuart did not consider that picking up Courtney between her legs by her father indicated an improper sexual touching.
This court finds that Sylvia Stuart was well within her professional capacity when she did not have reasonable cause to suspect or believe that Courtney had been sexually abused and therefore did not report the matter to DCF. From the evidence presented, the court finds that Courtney was not sexually abused by the defendant and there was not reasonable cause on March 17, 1998 or at the present time to believe that Courtney has been sexually abused by the defendant or that the defendant improperly touched her.
On April 29, 1998 DCF made a home visit to the plaintiff's residence arriving before the children came home from school. The maternal grandparents were present on that occasion. During that visit the Links contradicted themselves throughout the conversation sometimes stating that they wanted to stop the father's visits and other times stating that they had no problem with him visiting if he would take care of the children better. CT Page 4775 During the home visit the DCF worker spoke to the children. The DCF worker observed that "the children all sounded as though their answers were rehearsed and that they had been told what to say."
A call was received by the Department of Children and Families that the minor child Kenneth appeared at the office of the school social worker where he attends school. The information related to the Department of Children and Families was as follows:
 "The caller stated that the child in question, Kenneth Lane (10) went to her office and told her of an incident that happened on Tuesday night (October 13, 1998). The child told the reporter that his father `stretched his rear end and his peeper.' The child told the caller that his father does this every Tuesday and Thursday when he visit him. The child told the caller that he has been peeing red. The caller stated that she is not sure how in tune with reality the child is. The child told the caller last week that there is a little who at night crawls into his ear and up into his brain and controls what he does. The caller said that there may be a custody battle going on between the parent. The child is suppose to have visitation with his father this evening. Reporter knowledge of allegations (how and when): the caller is the school social worker. The child went to her office and told her. The caller said that the child also disclosed this information through the school nurse, Mrs. Rosa. . . . the parents are going to be informed by the caller's supervisor shortly.
The minor child Kenneth also stated that the defendant stretched his private part five to nine inches. He also stated that blood disappeared when anyone looked at it. The school nurse Mrs. Rosa did not consider Kenneth's story to be believable. A DCF worker investigated this allegation of sexual abuse. The DCF worker interviewed Kenneth and Courtney. Kenneth told him that he had gone to the bathroom and his father went to the bathroom with him, pushed him down, took his pants off, stretched his rearend like he was unwrapping a Christmas present or gift and pushed him around the walls about 15 time. He said at his mother's house when he went to the bathroom and he peed, his pee turned red. Every time that Kenneth would speak about the abuse his father had done to him, he would laugh. During the interview with Courtney, Courtney stated that Kenneth sometimes does not tell CT Page 4776 the truth so he does not have to go to school. Courtney stated that she knows when Kenneth lies because he laughs. Kenneth also told his mother that his father took a cup of pee and drank it at his father's house. The DCF worker found that the claim of sexual abuse was not valid. The defendant has totally denied the allegations made by his son regarding the alleged October 13, 1998 incident. From all the evidence presented, this court also concludes that this claim of sexual abuse is false.
All of the contacts made by the plaintiff's father to DCF were after he had spoken both to the plaintiff and his wife and everyone agreed that contacting DCF was appropriate.
The plaintiff made a wholesale attack on most if not all persons who testified whose testimony or position in this matter she viewed as a threat to her as a custodial parent. She questioned whether the family relation counselor who did the evaluation had made a vitriolic attack on her. The court finds that there was no basis for that charge by the plaintiff. In referring to the plaintiff Judge Steinberg stated "she repeatedly and ominously accused father of threatening the children's lives by exposing them to "spinal" meningitis. The plaintiff continued the spinal meningitis attack in this trial. In cross examining the defendant the plaintiff raised the issue of whether his sister Mrs. D'Amico was hospitalized due to spinal meningitis. The defendant denied such a hospitalization. The plaintiff at no time presented any credible testimony that such a hospitalization had ever taken place. She also crossed examined the defendant's sister Mrs. D'Amico as to whether Mrs. D'Amico's children ever had spinal meningitis or had been hospitalized at the Bridgeport Hospital for spinal meningitis. That claim was denied by Mrs. D'Amico and no credible testimony was presented that such a hospitalization had ever taken place or that the D'Amico children ever had spinal meningitis. The plaintiff had eleven meetings at Catholic Family Services between August 15, 1997 and February 2, 1998. When she met at Catholic Family Services on February 26, 1998, Catholic Family Services had received a copy of the memorandum of decision of Judge Steinberg. When confronted with the issues that she was to address in that decision, she claimed that Judge Steinberg was crazy and that he was running a scam against women through the court system. The claims regarding Judge Steinberg at best are ludicrous. She had disputes with the principal at the Simon Lakes School that is attended by all three children regarding their school attendance records. The following shows a record of the number of times the children were absent, CT Page 4777 tardy, and dismissed early from school for the school year September 1997 to June 1998.
Absent Tardy Early Dismissal
Kenneth 24 8 17 Brandon 12 3 17 Courtney 28 3 21
The plaintiff testified that she never threatened the school principal. She had, in fact, threatened to sue the school principal in front of other children and threatened to send police to her home. The plaintiff claims that at all of the visitation exchanges that took place between July 18, 1997 until October 20, 1997 that at least one member of the Rossi family was present. The court finds that that testimony was false. The defendant called as a witness the defendant's sister, Nancy Rossi. In cross examining Nancy Rossi, the plaintiff questioned her claiming that the plaintiff video taped Nancy Rossi at one of the McDonald's exchanges in which Nancy Rossi called the plaintiff a "fucking bitch, drunk, stupid and ignorant." The only attempt made by the plaintiff to introduce video tapes was through her father as a witness. The video tapes were not allowed to be marked as full exhibits as the plaintiff's father was not present when the videotaping was done and therefore was unable to identify the video tapes as accurately showing what they were purported to show. The defendant made it clear at that point in time of the trial that if the video tapes were to be marked as full exhibits that the defendant would be seeking to have them examined by an expert ahead of time to see if they had been tampered with. The plaintiff never attempted to qualify the video tapes herself to be marked as exhibits. Not withstanding this fact, the plaintiff still sought in final argument to have the court presume that the video tapes showed what she claimed they showed. The court finds as a matter of fact that Nancy Rossi never called the plaintiff a "fucking bitch, drunk, stupid or ignorant." In further cross examining Nancy Rossi the plaintiff claimed that Nancy Rossi had asked the plaintiff to stop sexually harassing Nancy Rossi's sixteen year old son. She further questioned Nancy Rossi regarding Nancy Rossi blocking the plaintiff's entrance to McDonalds. The implication was made during the cross examination that all of the above was shown on video tape. The court finds that at no time did Nancy Rossi accuse the plaintiff of sexually harassing Nancy Rossi's son and at no time did Nancy Rossi block the plaintiff's entrance to McDonalds. The plaintiff questioned Nancy Rossi as to whether she CT Page 4778 suffered from depression and whether she went bar-hopping with the defendant. There was absolutely no credible testimony whatsoever to indicate that Nancy Rossi suffered from depression or that she and brother went bar-hopping together. In questioning Arthur Rossi she falsely accused him of having body odor and wrongfully referred to him as a gorilla. She questioned Pasquale D'Amico as to whether he had called her a "sick son of a bitch" claiming in the questioning that she had that recorded on tape. The court finds that Pasquale D'Amico never called the plaintiff a "sick son of a bitch." The plaintiff has also attacked the qualifications of Attorney Trowbridge to serve as guardian-ad-litem. The court finds that he is imminently qualified for that position in this case. She also falsely questioned him as to whether he was paranoid. There was absolutely no basis in fact for the plaintiff to ask that question of Attorney Trowbridge. After the plaintiff called Attorney Trowbridge as a witness she questioned him as to lawsuits that could be brought against him and his legal liability if custody of the children were changed. The plaintiff and her father were not alone in their attacks upon the defendant or his family. The plaintiff's mother Regina Link claims that when she was in West Haven, Connecticut that Arthur Rossi approached her vehicle where she was parked and was yelling at her. She claims that he said "turn your fucking head around." The court finds that that claim is not credible and that there was nothing in the behavior of Arthur Rossi that was inappropriate and that he did not make the above statement to Mrs. Link. The plaintiff filed a motion for sanctions against Mary DePaola dated September 1, 1998 coded #348 raising the question of the professional, ethical and moral obligations of Mary DePaola. There was absolutely no factual basis for that motion to be filed based on all the evidence that the court heard in this trial. She also filed a motion for new custody evaluation and continuation of trial date until its completion dated September 8, 1998 coded #353. In that motion she raised issues as to the "trustworthiness of the custody evaluation prepared by Mary DePaola because of the misrepresentations as to the children's social growth and academic performance; omissions, and new evidence of physical abuse and threatening which was not disclosed in the current report." The court finds that the custody evaluation is trustworthy. The plaintiff's questioning of witnesses can best be described as a false attempt at wholesale character assassination.
This court also agrees with Judge Steinberg's observation CT Page 4779 that mother "refuses to accept court adjudications as to conclusions of her claims, raising them again and again after a court rejects her position."
The plaintiff filed a motion for contempt coded #277 dated July 22, 1997 relating to pendente lite orders and the arrearage arising out of nonpayment of pendente lite orders, claiming the arrearage was greater than found by Judge Steinberg on July 18, 1997. That motion was filed in the Ansonia/Milford district and the court ordered the clerk not to calendar the motion for contempt because to do so would permit and countenance an abuse of legal process as all of the matters concerning arrearages and counsel fees could have been raised and should have been raised in the trial of the case before Judge Steinberg. The plaintiff filed a motion to modify the visitation orders and then filed an addendum to that motion with the addendum being coded #280 and dated July 28, 1997, 10 days after Judge Steinberg filed his memorandum of decision. Under the proposed addendum to the motion to modify the defendant would not have overnight visitations and would not have visitation on Tuesdays and Thursdays.
The plaintiff filed a motion dated September 1, 1998 coded #348 seeking to again raise the claims that were decided by Judge Munro on June 9, 1998. She filed a motion for contempt coded #340 dated July 23, 1998 against Attorney Trowbridge. That motion was denied on August 4, 1998. The plaintiff had filed a motion for appointment of a new guardian ad litem dated June 30, 1998 coded #335. That motion was denied on July 20, 1998 on the grounds that as parent she did not have standing to raise the issue of removal. Many of the same arguments that she raised in that motion coded #335 were raised in her motion for contempt against Attorney Trowbridge coded #340 again seeking his removal as guardian-ad-litem. The motion coded #340 was denied on August 4, 1998. She filed a motion for contempt dated January 20, 1998 coded #309. In that motion she raised issues regarding noncompliance by the defendant regarding maintaining health insurance, life insurance, reimbursement of medical bills and providing health insurance cards. That motion was denied on February 3, 1998. She also alleged that the amount of arrearage from pendente lite orders found by Judge Steinberg in his memorandum of decision of July 18, 1997 was wrong and that the defendant owed the plaintiff additional money regarding medical reimbursement. Approximately 5 months later the plaintiff filed a series of separate motions substantially alleging the same issues that were denied regarding her motion coded #309. She filed a CT Page 4780 motion for contempt coded #336 dated July 22, 1998 regarding the defendant's obligation to pay 50% of unreimbursed healthcare. That motion was again denied with an order that Attorney Parley determine what portion of the unreimbursed medical expenses were owed. She filed a motion for contempt coded #337 dated July 22, 1998 again raising the issue of the defendant's obligation to maintain health insurance. That motion was again argued by her on August 4, 1998 and again denied. She filed a motion for contempt dated July 22, 1998 coded #338 again raising the issue of the defendant maintaining life insurance. That motion was again argued by her on August 4, 1998 and again denied. She filed a motion for contempt coded #339 regarding the defendant's obligation to provided health insurance cards. That motion was again argued by her on August 4, 1998 and again denied with the further proviso that Attorney Parley would get the medical identification cards to determine if they are valid. She filed a motion dated January 20, 1998 coded #311 again seeking to raise pendente lite arrearages.
The parties were before Judge Kenefick on August 4, 1998 regarding a number of motions. The transcript of that proceeding as shown on plaintiff's Exhibit 13 in part is as follows:
 MS. LANE: Well, if Mr. Lane followed Judge Steinberg's orders we wouldn't be coming back. We would not. If Mr. Trowbridge had helped, like he was suppose to, like Judge Steinberg had said to in his thing, we wouldn't be back here every other week. I'll be back in front of you, by the eighteenth, with two of Mr. Lane's motions. And as far as the custody hearing none was filed until July the twenty-ninth.
 THE COURT: As far as what was concerned? I didn't hear you.
 MS. LANE: As far as the custody. Mr Lane just filed the motion for custody on the twenty-ninth. Well be in front of you by the eighteenth. It was just filed. There's none in there. There is no motion, come January, when this custody thing went on. It was never — There was no motion in front of the Court by any moving party.
THE COURT: Then why was a study done?
MS. LANE: Because Mr. Lane kept saying, I'm not getting my kids, I'm not getting my kids. He let it go off. There wasCT Page 4781 no motion for a custody hearing. There was no motion for anything.
 MR. TROWBRIDGE: I believe there's a motion for modification in the file. And Judge Munro ordered the custody, the study after the motion for modification was filed —
 MS LANE: It was a motion for contempt, your Honor. He let it go off.
 MR. TROWBRIDGE: I believe that was filed last January or February.
 MR. LANE: Your Honor, I don't recall the exact dates, but there were several motions on that day and I was looking to call several witnesses, probably about twelve. And all that I allowed to go off, in lieu of a new custody evaluation, which was ordered at that time.
MS. LANE: There was no motion though, your Honor.
 THE COURT: All right, but there is a trial date scheduled for —
MR. TROWBRIDGE: October twenty-eighth, your Honor.
 THE COURT: Mr. Lane filed a motion asking the Court to grant him permanent sole physical custody back in November of 97. So there is a motion in the file.
 MS. LANE: Then where was mine your Honor? I never received it.
 THE COURT: I'm just telling you what's in the file ma'am. There is a motion, in the file, and it's been certified as having been sent to you, Attorney Trowbridge and Attorney Parley.
 MS LANE: What day was that? November the what, your Honor?
THE COURT: November 17, 1997, there us a motion in the file. It's #296 if you want to make a record of it. (emphasis provided) CT Page 4782
The defendant had filed 5 motions all dated November 17, 1997. One was a motion for contempt coded #293, the second was a motion for order coded #295, the third was a motion for modification of custody coded #296, the fourth was a motion to reargue coded #297 and the fifth was a motion for return of evidence coded #298. The plaintiff filed a "brief-reply of the plaintiff-mother to motions filed by the defendant dated November 17, 1997", dated December 4, 1997 and filed stamped December 5, 1997. That brief starts out by stating that "on November 17, 1997 the defendant, Kenneth Lane filed five motions." The plaintiff then went on to address each of the five motions in her brief dated December 4, 1997 including the motion for modification of custody filed by the defendant. Counsel for the minor children filed a "reply of children's attorney to motions to file by defendant, dated November 17, 1997." That reply brief filed by counsel for the minor children was dated November 24, 1997 and there was a certification that a copy of that reply was sent to both the plaintiff, the defendant and the guardian ad litem. That reply brief referred to the five motions previously filed by the defendant dated November 17, 1997 including the motion to modify custody. The court finds that the plaintiff in representing to Judge Kenefick that there was no motion pending by the defendant for change of custody until July 29, 1998 and that she had not received a copy of any motion filed by the defendant in November of 1997 were lies. The following is summary of lies by the plaintiff since July 18, 1997:
1. She lied when she testified she was in treatment at Milford Mental Health.
2. She lied when she testified she was in treatment by the Reverend Dr. Page.
3. She lied when she testified that the children's counseling with the Reverend Dr. Page was pastoral only.
4. She lied when she testified that she was never requested by Milford Mental Health to have a psychiatric evaluation.
5. She lied when she testified that she never threatened the school principal.
6. She lied when she testified that a member of the Rossi family was present at all exchanges at McDonalds between July 18, CT Page 4783 1997 and November 10, 1997.
7. She lied to Ms. Ramos of DCF when she told Ms. Ramos on April 23, 1998 that the defendant was sexually abusing Courtney and should be investigated for that.
8. She lied to Sylvia Stuart of Milford Mental Health when she stated to her on January 28, 1998 and again on March 4, 1998 that Sylvia Stuart had not requested that she have a psychiatric evaluation.
9. She lied in a letter to Milford Mental Health dated March 21, 1998 claiming that there was a crisis situation regarding physical abuse by the defendant in disciplining the children on August 5, 1997.
10. She lied to the Milford Police Department when she claimed that on July 22, 1997 her brother-in-law Arthur Rossi had become verbally abusive at the McDonald parking lot and was yelling at her and stated that he was going to kill her.
11. She lied to Lorri Ballaro at Catholic Family Services when she told Catholic Family Services on September 12, 1997 that it was the first one to report abuse to DCF.
12. She lied to Lorri Ballaro at Catholic Family Services on September 12, 1997 when she stated that the defendant was physically, verbally and sexually abusive to the children.
13. She lied in a letter that she wrote to the defendant dated September 30, 1997 that Courtney had to be accompanied by her mother to Brownie meetings.
14. She lied to Judge Kenefick at a hearing on August 4, 1998 when she stated that there was no motion filed to modify custody until July 29th and when she stated that she never received the motion that the defendant filed in November of 1997 to modify custody.
15. She lied to her children in telling them that they should not eat food at the Rossi home because the food was poisoned.
16. She lied in a phone call to Milford Mental Health on October 15, 1997 that Kenneth had threatened suicide. CT Page 4784
17. She lied to Lorri Ballaro at Catholic Family Services on September 12, 1997 and September 16, 1997 when she stated that Kenneth had threatened suicide.
18. She lied when she told Mary DePaola, the family relation counselor who did the study, that she had no idea why the children call their father "Mr. Ken."
There was also one lie by the defendant to Mary DePaola when he stated that the plaintiff has a caller I. D. system on her telephone. The plaintiff in fact has call tracing and not caller I.D.
This court has had the benefit of a thorough and competent family relation report. In obtaining information to prepare the report, the family relation counselor was refused by the plaintiff permission to interview the children individually. In April 1998, the plaintiff restricted any contact that the family relation counselor could have with Sylvia Stuart. On May 13, 1998 the plaintiff restricted any contact that the family relation counselor could have regarding Catholic Family Services records.
Kenneth has also been diagnosed as having adjustment disorder with depression and anxiety. He has also been diagnosed as having pervasive developmental disorder. Both Brandon and Courtney have been diagnosed as having adjustment disorder with mixed anxiety and depressed mood.
The Simon Lakes School has done a marvelous job in meeting the educational needs of Kenneth. There is a procedure that would allow the children to finish out the school year in the Milford School system. It requires the approval of the superintendent. It has been done in the past but there is no guarantee that it would be done regarding the Lane children. There is no reason to believe that the Bridgeport School System could not do as good a job as the Milford School System has done in meeting the educational needs of Kenneth.
The court finds from the testimony presented as well as from a Milford Mental Health record dated March 18, 1998 the following:
While the children were very attached to Mrs. Lane, they often seem to act out and be more agitated in her presence. When Mr. Lane brought the children in, they were calmer and CT Page 4785 less agitated. . . . Mrs. Lane's behavior was often erratic and inconsistent. She acted in an aggressive and inappropriate manner and on several occasions became argumentative, demanding and insulting to others at MMHC. She signed release of information forms and soon afterwards rescinded them, ignoring their importance to the treatment of the children. During conversations with Mrs. Lane, she showed an extreme disdain for the children's father and made no attempt to hide this from the children. They were frequently exposed to and encouraged to mimic this disrespect to their father. They rarely called him "dad" in their mother's presence-only, "Mr. Ken" or sometimes other insulting names . . . Mrs. Lane's aggressive behavior seems to clearly affect the children.
The plaintiff's own anxiety seem to create further difficulties for Kenneth and he often expressed fear of losing his mother as well as his father. He seemed eager to have a relationship with his father but could not express this for fear of offending his mother. Courtney also felt that connections to her dad were betrayals to her mom. The minor child Brandon smiled more when he was brought to therapy with the defendant rather than with the plaintiff. He appeared to be depressed and sad with the plaintiff. Brandon is very whiny in school and always wants to go home to be with his mother. He constantly complains about being sick. The plaintiff and her parents are inappropriate with the children, reading them the court decisions and talking negatively about the defendant all the time. Kenny has gone to the nurses office and stated that when he was at his father's over the weekend that his father was smoking outside and the smoke came into the house through the screen and into the vents and he breathed it and got sick. This court agrees with the school nurse that statements made by the minor child Kenneth did not come from him but had been told to him.
The maternal grandparents are determined to terminate visitation by the father. The plaintiff's father has provided an average of $200 to $400 monthly for her benefit and the benefit of the children whenever the plaintiff was in need of funds.
The plaintiff has gone out of her way to create conflict with people who are involved in the children's lives who she views as a threat to her custodial relationship with the children. Despite the unrelenting charges filed against the defendant and his family by the plaintiff and her parents, he has fought to play CT Page 4786 the role of a father. He is dedicated to the children and in control of himself.
In discussing the best interest of the child standard; the court in Cappetta v. Cappetta, 196 Conn. 10, 16, 17 (1985) stated in part as follows:
 The award of custody requires the trial court to make difficult and sensitive inquiries into the relationships between adults and children. In the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment. Such a search requires the court to afford all interested parties an opportunity for a hearing concerning the qualifications of each person who is or may be a candidate for custody. It is essential to inquire into each person's parenting skills as well as his or her relationship with the child.
The best interest of the child standard was referred to by the court in Blake v. Blake, 207 Conn. 217, 224-225 (1988) stating in part as follows:
 In making a determination of custody, the trial court is "bound to consider the child's present best interests and not what would have been in her best interests at some previous time."
The Blake court also cited with approval the case of Yontefv. Yontef, 185 Conn. 275, 283, 440 A.2d 899 (1981). The Yontef
court held in part as follows:
The test is not which parent was the better custodian in the past but which is the better custodian now. See, e.g. Trunik v. Trunik, 179 Conn. 287, 290, 426 A.2d 274
(1979) Spicer v. Spicer, supra, 164; Simons v. Simons, supra, 350. Just as we have refused to adopt a conclusive presumption that a mother is always entitled to custody in preference to a father; see, e.g., Simons v. Simons, supra, 350; so also have we rejected any presumption that a parent's life style necessarily has an adverse effect on a child. Gallo v. Gallo, CT Page 4787 184 Conn. 36, 42, 440 a.2d 782 (1981). In the exercise of its awesome responsibility to find the most salutary custodial arrangement for the children of divorce, the court must however take account the parents' past behavior, since it must evaluate their present and future parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being. Seymour v. Seymour, supra, 711. (Emphasis provided)
Cookson v. Cookson, 201 Conn. 229 (1986) was an appeal from the modification of a dissolution of marriage judgment which modification transferred custody of three minor children from the plaintiff to the defendant. In sustaining the action of the trial court in modifying custody, the court in Cookson referred to the trial court's summarization of its conclusions in the following manner at page 242:
 "Return to the home of the parent who obstructed the children's relationship with their father, who permitted someone other than herself to impose humiliating and frightening punishments for relatively minor misbehaviors and who lied and defied court orders, is inconsistent with the best interests of these children."
In this case, the plaintiff did not impose humiliating and frightening punishments on the minor children. She has, however since the date of dissolution obstructed the children's relationship with their father, has lied during the trial before the undersigned and has lied to others, and has consistently defied court orders.
The children will have less stress residing with the defendant. Their emotional health will have a better chance to improve residing with the defendant. The defendant appreciates the need for both parents to have a relationship with the children which the plaintiff does not.
The court finds that it is in the best interest of the children that custody be modified and that the defendant be awarded sole custody for all of the following reasons, both separately and collectively:
CT Page 4788 1. The plaintiff has undermined and obstructed the defendant's relationship with the children since July 18, 1997;
 2. The plaintiff has defied court orders by interfering with the visitation right of the defendant since July 18, 1997;
 3. The plaintiff has defied court orders by failing to consult with the defendant regarding non-emergency healthcare since July 18, 1997;
 4. The plaintiff has defied court orders by supporting an activity that competed with the defendant's access to Courtney, since July 18, 1997;
 5. The children's emotional health has deteriorated, since July 18, 1997;
6. The plaintiff has lied;
 7. The plaintiff is a danger to the best interest of the children as a result of the false relentless attacks by her and her parents on the defendant and his family, since July 18, 1997 and her aggressive behavior;
 8. The plaintiff attempts to remove from the lives of the children anyone she perceives as threatening her maternal bond, having sought to remove the family relation counselor, the guardian ad litem, as well as threatening to sue the school principal;
 9. The children's growth, development and well-being will be better fostered by the defendant than by the plaintiff.
The burden of proving that a change of custody is in the best interest of each child rests on the party seeking the change, which in this case is the defendant. The court finds that the defendant has met his burden. This court has considered the provision of Section 46b-56 and has given consideration to the wishes of the minor children. The children have stated that they wish to continue to live with the plaintiff. They are attached to both the plaintiff and the defendant. CT Page 4789
The family relation counselor has recommended that the defendant have custody of the three children. Their guardian-ad-litem had recommended that the defendant have custody of the three children. Counsel for the minor children has recommended that the plaintiff continue to have custody.
 ORDER
The court enters the following orders:
A. BY WAY OF VACATING ORDERS:
1. Paragraphs 2 and 3 of the orders entered by Judge Steinberg on July 18, 1997 are vacated effective May 1, 1999.
2. Paragraph 7 of the orders entered by Judge Steinberg on July 18, 1997 regarding child support are vacated effective May 1, 1999.
3. Paragraph 15 of the orders entered by Judge Steinberg on July 18, 1997 is vacated effective May 1, 1999.
4. All of the orders of Judge Steinberg dated July 18, 1997 that have not been expressly vacated remain in full force and effect.
5. All of the orders entered on November 10, 1997 regarding who can be present at McDonalds when the children are exchanged and how that exchange is to take place and requiring that the plaintiff and the defendant be present at the exchange are vacated effective May 1, 1999.
6. The existing support order is vacated effective May 1, 1999. No support order is entered against the plaintiff at this time as the custody hearing did not involve testimony as to what the amount of the support order if any should be for the plaintiff to pay in the event the defendant obtained custody. In the event the defendant is seeking a support order he will have to file a motion to that effect.
B. BY WAY OF MODIFICATION OF CUSTODY
1. The defendant is awarded sole custody of the three minor children of the parties effective May 1, 1999 subject to the plaintiff's visitation rights at outlined in paragraph C. CT Page 4790
2. The defendant shall have final decision-making authority in all matters relating to the children's medical, therapy and educational care. The plaintiff shall not initiate any medical, therapy or educational care for the children without the prior written consent of the defendant except in the case of emergency.
C. BY WAY OF VISITATION 1. Plaintiff's Interim Visitation Rights
a. There will be a period of adjustment for the children regarding the custody change. On May 1, 1999 the plaintiff is to bring the children to McDonalds in Devon, Connecticut at 10:00 a.m. where they are to be turned over to the custody of the defendant. The plaintiff is not to leave McDonalds on that date with any of the children and is not to allow the children to leave McDonalds with any other person.
b. The defendant is to make all reasonable efforts to have the children finish their school year in the Milford school system. The plaintiff is responsible for being in contact with the Milford school system to see if the children are being allowed to finish the present school which will end in June 1999. In the event the children remain in the Milford school system through the end of the present school year, then in such event they are to visit with the plaintiff each Friday commencing May 7, 1999 by returning to the plaintiff's present residence on the school bus and remaining with the plaintiff until the following Monday where they are to return to school on the school bus. The defendant will then have the responsibility of seeing to it that the children are picked up after school on Monday, Tuesday, Wednesday and Thursday where they would remain with him overnight. He would also have the responsibility of seeing to it that the children get to school on Tuesday, Wednesday, Thursday and Friday. This schedule will remain in place until the present school year ends in June 1999.
c. In the event the children are not able to finish the school year in the Milford School System, then the visitation for the plaintiff through the end of the school year is to commence every Friday at 4:30 p. m. at McDonalds and will last until Monday morning when the plaintiff will bring the children to their new school in Bridgeport. The children will then return to the defendant's residence on Monday, Tuesday, Wednesday and Thursday CT Page 4791 after school and remain with him for Monday, Tuesday, Wednesday and Thursday overnight. He will have the responsibility of seeing to it that the children get to school on Tuesday, Wednesday, Thursday and Friday. This schedule will remain in place until the present school year ends in June 1999.
 2. Plaintiff's Normal Visitation
a. Regardless of the day of week when the present school year ends, the children are to remain with the defendant commencing on the first day that the present school year end until the second Friday after the school year ends. By way of illustration, if the school year ends on Friday June 11th then the second Friday is June 25. If the school year ends on June 15th then the second Friday is also June 25. Commencing on the second Friday in June following the end of the school year the children are to be with the plaintiff on alternate weekends from Friday at 4:30 p. m. until Sunday at 4:30 p. m. In addition the children are to visit with the plaintiff for two weeks commencing with the second Friday of each July starting at 4:30 p. m. and ending on Sunday 16 days later at 4:30 p. m. She is also to have visitation with the children for two weeks in each August from the first Friday in August until Sunday 16 days later commencing on Friday at 4:30 p. m. and ending at 4:3p. m.
b. There is to be no audio taping or video taping at the exchange of the children by either party during interim and normal visitation.
c. The illness of any child may become the basis for missing a visitation only upon presentation of the time of the scheduled visitation of a dated, signed note from a medical doctor specifying the illness and the period of absence required.
D. COUNSEL FOR MINOR CHILDREN AND GUARDIAN AD LITEM
1. The court expresses its appreciation for the high professional manner that counsel for the minor children and guardian ad litem for the minor children have acted throughout this trial.
2. Both counsel for the minor children and their guardian-ad-litem have the right to meet with the minor children to discuss the reasons for the change of custody with them to the extent either deem it advisable. Both the plaintiff and the CT Page 4792 defendant are to cooperate with the request for any such meeting by either counsel for the minor children and/or their guardian-ad-litem.
E. MISCELLANEOUS CUSTODY AND VISITATION ORDERS
1. Neither party shall remove any of the children from the State of Connecticut for a period in excess of 7 consecutive days without the prior approval of the court.
2. Neither party is to apply for or allow anyone else to apply for any passport for any of the three children without prior approval of the court.
3. Thanksgiving 1999 shall be with the father until 4:00 p. m. and with the mother from 4:00 p. m. until the following day at 4:00 p. m. The parties will then alternate this schedule annually thereafter.
4. Christmas 1999 will be with the mother from Christmas Eve noon until Christmas day at noon and with the father from Christmas day at noon until the following day at noon. This schedule will be alternated annually thereafter.
5. Easter Sunday 2000 shall be with the defendant from 10:00 a.m. until 6:00 p. m. and shall be alternated annually.
6. July 4, 1999 shall be with the defendant from 10:00 a.m. until 6:00 p. m. and shall be alternated annually.
7. On those weekends when the children are with the plaintiff immediately before Memorial Day or Labor Day they shall remain with the plaintiff on Memorial Day or Labor Day with the return at 4:00 p. m.
8. Each Mother's Day the children will spend with the plaintiff from 9:00 a.m. to 6:00 p. m. and will spend each Father's Day with the defendant.
9. The mother shall have telephone access with the children once daily between 7:00 p. m. and 7:30 p. m on Monday, Wednesday, Friday and Saturday when they are with their father. The father shall have telephone access with the children once daily between 7:00 p. m. and 7:30 p. m. on Saturday when the mother has visitation. Telephone access to and from the maternal CT Page 4793 grandparents shall be at the father's discretion.
10. All visitation exchanges shall take place in the parking lot at McDonalds Restaurant in Milford. There shall be no contact between the parents or their transportation delegates.
11. The holiday schedule provided for herein as well as the vacation schedule takes priority over the regular weekend schedule.
Axelrod, J.